

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
El PASO DIVISION

| | | |
|---|---|---|
| **BRANDON CALLIER,** | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| **BITTY ADVANCE 2, LLC,** a Wyoming Limited | § | **EP-21-CV-00158** |
| Liability Company, **MCA SERVICING, LLC,** a | § | |
| Wyoming Limited Liability Company, and | § | |
| **CRAIG HECKER, FABRICE FELLOUS,** | § | |
| **THE APPROVAL DEPARTMENT, LLC** dba | § | |
| **NEXTDAY MCA** | § | |
| | § | |
| Defendants. | § | |
| | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

### PARTIES

NOW COMES PLAINTIFF BRANDON CALLIER with his First Amended Complaint

herein and alleges and states as follows:

### PARTIES

1. The Plaintiff is BRANDON CALLIER ("CALLIER"), a natural person, resident of the
   Western District of Texas and was present in Texas for all calls, in this case in El Paso
   County.

2. Defendant BITTY ADVANCE 2, LLC ("BITTY") is a Wyoming limited liability company
   with a principal address of 30 N Gould Street Suite 2555, Sheridan, Wyoming 82801 and can
   be served via registered agent Registered Agents, Inc., 30 N Gould Street, Suite R, Sheridan
   Wyoming 82801.

3. Defendant MCA SERVICING, LLC ("MCA") is a Wyoming limited liability company with

a principal address of 1940 Harrison Street, Suite 301, Hollywood, Florida 33020 and can be served via registered agent Registered Agents, Inc., 30 N Gould Street, Suite R, Sheridan Wyoming 82801.

4. Defendant CRAIG HECKER ("HECKER") is a current Officer of both MCA Servicing, LLC and Bitty 2 Advance, LLC and can be served at 1940 Harrison Street, Suite 301, Hollywood, Florida, 33020.

5. Defendant FABRICE FELLOUS ("FELLOUS") is the Chief Executive Office of The Approval Department, LLC dba Next Day MCA and can be served at 4509 Simple Promise CT, Las Vegas, Nevada 89130.

6. Defendant THE APPROVAL DEPARTMENT, LLC d/b/a NEXT DAY MCA ("APPROVAL") and can be served via registered agent Jean-Luc Fellous at 4509 Simple Promise CT, Las Vegas, Nevada 89130.

## JURISDICTION AND VENUE

7. <u>Jurisdiction</u>. This Court has federal-question subject matter jurisdiction over Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). This Court has supplemental subject matter jurisdiction over Plaintiff's claim arising under Texas Business and Commerce Code 305.053 because that claim arises from the same nucleus of operative fact, i.e., Defendants' telemarketing robocalls to Plaintiff; adds little complexity to the case; and doesn't seek money damages, so it is unlikely to predominate over the TCPA claims.

8. <u>Personal Jurisdiction</u>. This Court has general personal jurisdiction over the defendant because they have repeatedly placed calls to Texas residents, and derive revenue from Texas residents, and they sell goods and services to Texas residents, including the Plaintiff.

9. Venue.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims—the calls and sale of goods and services directed at Texas residents, including the Plaintiff—occurred in this District and because the Plaintiff resides in this District.  Residing in the Western District of Texas when he received a substantial if not every single call from the Defendants that are the subject matter of this lawsuit.

10. This Court has venue over the defendants because the calls at issue were sent by or on behalf of the above-named defendants to the Plaintiff, a Texas resident.

## THE TELEPHONE CONSUMER PROTECTION ACT OF 1991, 47 U.S.C. § 227

11. In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*.  Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally.  *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

12. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

13. The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C.

3

§ 227(b)(1)(B).

14. The TCPA provides a private cause of action to persons who receive calls in violation of §
227(b). 47 U.S.C. § 227(b)(3).

15. Separately, the TCPA bans making telemarketing calls without a do-not-call policy available
upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

16. The TCPA provides a private cause of action to persons who receive calls in violation of §
227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

17. According to findings of the FCC, the agency vested by Congress with authority to issue
regulations implementing the TCPA, automated or prerecorded telephone calls are a greater
nuisance and invasion of privacy than live solicitation calls and can be costly and
inconvenient.

18. The FCC also recognizes that "wireless customers are charged for incoming calls whether
they pay in advance or after the minutes are used." *In re Rules and Regulations
Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

19. The FCC requires "prior express written consent" for all autodialed or prerecorded
telemarketing robocalls to wireless numbers and residential lines.  In particular:[A]
consumer's written consent to receive telemarketing robocalls must be signed and be
sufficient to show that the consumer:  (1) received clear and conspicuous disclosure of the
consequences of providing the requested consent, *i.e.*, that the consumer will receive future
calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having
received this information, agrees unambiguously to receive such calls at a telephone number
the consumer designates. In addition, the written agreement must be obtained without

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017)
(codifying a June 26, 2003 FCC order).

requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

20. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

21. The FCC confirmed this principle in 2013, when it explained that "a seller ... may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

22. Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

23. A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

### The Texas Business and Commerce Code 305.053

24. The Texas Business and Commerce code has an analogous portion that is related to the TCPA and was violated in this case.

25. The Plaintiff may seek damages under this Texas law for violations of 47 USC 227 or subchapter A and seek $500 in statutory damages or $1500 for willful or knowing damages.

### FACTUAL ALLEGATIONS

26. Plaintiff has been on the National Do-Not-Call Registry since December 2007.

27. Defendants utilize Independent Sales Organizations (ISO) and/or Brokers to solicit business sales purchase agreements on behalf of Defendants.

28. Defendant Bitty's website www.bittyadvance.com has a hyperlink on the home page titled "ISO Portal" with a hyperlink address of https://broker.bittyadvance.com.  Clicking this link takes the user to the login page for Bitty's ISO and/or Broker agents and representatives.

29. Bitty's agents and/or Brokers access the Bitty website to directly input applications and obtain information on customers.

30. Bitty directly emails agents and/or brokers directly incentivizing agents and/or brokers to solicit on behalf of Bitty.

31. Bitty offers bonuses to agents and/or brokers who hit sales goals and input and process applications on behalf of Bitty.

32. Bitty's agents and/or brokers use software, hardware, and infrastructure owned by Bitty.

33. Calls were made by agents of Defendant Approval dba Next Day MCA.

34. Defendant Fellous is the chief executive officer of Defendant Approval, controls and dominates Defendant Approval, and approved and signed the contracts that led to the calls in this case.

35. The Plaintiff has received at least 29 calls over 45 days to his cell phone, 915-383-4604 without consent and not related to an emergency purpose, soliciting business funding products and services of Defendants.

36. The Plaintiff did not want or need business funding. However, in order to cease harassment from the anonymous robocallers, such as the defendants, Plaintiff eventually told the representative he needed business funding for the sole purpose of identifying who was calling and/or the company who was responsible for calling.

37. Beginning November 2, 2020, Plaintiff began to receive nearly daily autodialed phone calls from Defendant Apprvoal operating on behalf of, and for the benefit of, Defendant Bitty and Defendant MCA.

38. On November 2, 2020, Plaintiff received the first of a series of automated calls from phone number 646-343-5616. Plaintiff answered the phone and heard about 10 seconds of silence before there was an audible "beep."

39. Plaintiff was connected to a representative who asked Plaintiff questions about his business funding needs in an effort to solicit on behalf of Defendant Bitty.

40. On October 5, 2020, Plaintiff received the first of a series of automated calls from phone number 551-213-5331. Plaintiff answered the phone and heard about 10 seconds of silence before there was an audible "beep."

41. Plaintiff was connected to a representative who asked Plaintiff questions about his business funding needs in an effort to solicit on behalf of Defendant Bitty.

42. On November 24, 2020, Plaintiff received an automated call from phone number 915-373-4754 displaying "Oscar Dominguez" on the caller ID.

43. Plaintiff answered the phone and heard an audible "beep" before he was connected to a third-

party representative who identified himself as "Mac" and asked the Plaintiff qualifying questions about his business revenues, debts and credit score.

44. The third-party representative asked for the Plaintiff's email address and sent the Plaintiff an email asking the Plaintiff to send his bank statements.

45. "Mac's" email indicated he was employed by and/or represented NextDay MCA with a location of 36-36 33rd street, suite 103 Long Island, New York 11106 and phone number 888-487-4621.

46. The third-party representative sent the Plaintiff a second email asking the Plaintiff to fill out an electronic application for business funding.

47. The Plaintiff declined to send the bank statements and ended the phone call.

48. On November 24, 2020 at 2:45 PM the Defendant's third-party representative again called the Plaintiff from 915-373-4754 displaying "Oscar Dominguez" on the caller ID.

49. The Plaintiff answered the phone, spoke to "Mac," and again declined to send in the application.

50. On November 24, 2020 at 3:09 PM the Defendant's third-party representative again called the Plaintiff from 915-373-4754 displaying "Oscar Dominquez" on the caller ID.

51. Plaintiff answered the phone and "Mac" asked the Plaintiff to submit an application.

52. The Plaintiff asked "Mac" where he was located.

53. "Mac" replied he was located in New York.

54. Plaintiff asked "Mac" why the caller ID displayed 915 area codes if he is located in New York.

55. Mac then informed the Plaintiff he was "calling using automated dialing and the system gives it that number." Mac then asked the Plaintiff if he "wanted to be called from his (Mac's) real

8

number" in order to "make you (Plaintiff) feel better."

56. The Plaintiff said "yes call me from your real phone number whenever you call me" and Mac

hung up the phone and called the Plaintiff from a different phone number.

57. Plaintiff told "Mac" multiple times to not call him and to stop using spoofed caller IDs so

Plaintiff could know who was calling and whether he wanted to answer the phone.

58. "Mac" called the Plaintiff from phone number 888-487-4621, the phone number on the MCA

website, three times:  November 24, 2020 at 3:12 PM, 3:33 PM, and 5:12 PM indicating he

was fully capable of dialing the Plaintiff properly and was intentionally and willfully using

autodialing technology.

59. On November 25, 2020 "Mac" called the Plaintiff four more times using autodialed spoofed

915 area code phone numbers:  8:54 AM and 11:43 AM from phone number 915-494-8244,

10:41 AM form phone number 915-630-8887, and again from 915-373-4754 at 1:05 PM.

60. Plaintiff became annoyed with the phone calls and attempted to locate details on NextDay

MCA.

61. Plaintiff searched the stated business address, phone number, and name and was unable to

find any verifiable information on the company NextDay MCA.

62. Plaintiff hired an investigative company to locate the company.

63. The investigative company was unable to find any information on NextDay MCA and the

stated address on the Next Day MCA website belongs to a company called American

Medical Alert Corp (AMAC).

64. On November 25, 2020, Plaintiff asked business owner Justin Johnson (Johnson) to apply for

a loan through Defendant Bitty's ISO and/or Broker so he could find out who was harassing

him with repeated phone calls and requests for personal information.

65. Plaintiff gave "Mac" Johnson's cell phone number and told him to call.

66. On November 25, 2020, the Independent Sales Organization and/or Broker called Mr.
Johnson on behalf of Defendant Bitty and Defendant MCA.

67. "Mac," despite having Johnson's phone number, called Johnson a total of five times using
autodialing technology that spoofed the caller ID to read with 214 area codes

68. Johnson's phone number has a 214 area code.

69. Johnson applied for and received approval for a loan from Defendant Bitty.

70. On November 25, 2020 Defendant Bitty's ISO/Broker emailed Johnson a link
(https://www.decisionlogic.com/G3V743) requesting Johnson verify his bank account.

71. Clicking the link sent Johnson to a webpage owned by Bitty.

72. On November 25, 2020 Johnson received an email from Defendant Bitty's employee and/or
agent Alejandra Romero, with an email address of aly@bittyadvance.com requesting
Johnson sign the contract approved by Defendant Bitty.

73. Defendant Bitty and Defendant MCA are both listed as beneficiaries in the approved
contract.

74. Johnson provided Plaintiff a copy of the loan paperwork and discovered it was Defendant
Bitty and Defendant MCA behind the illegal robocalls.

75. On November 30, 2020 at 8:49 AM Plaintiff received a missed call from phone number 915-
533-2000.

76. On November 30, 2020 at 11:35 AM Plaintiff received and answered a call from 915-533-
2000.

77. When Plaintiff answered the phone there was a 10 second delay before "Mac Jones" came on
the phone and asked Plaintiff about sending in the application and bank statements.

78. Two minutes later "Mac Jones" sent Plaintiff another email requesting bank statements.

79. On November 30, 2020 at 2:23 PM Plaintiff received and answered a call from 915-474-2609.

80. When Plaintiff answered the phone there was a 10 second delay before "Mac Jones" came on the phone and asked Plaintiff about sending in the application and bank statements.

81. Two minutes later "Mac Jones" sent Plaintiff yet another email requesting bank statements.

82. On December 1, 2020 at 9:31 AM Plaintiff received and answered a call from 915-497-0064.

83. When Plaintiff answered the phone there was a 10 second delay before "Mac Jones" came on the phone and asked Plaintiff about sending in the application and bank statements.

84. Plaintiff informed "Mac Jones" he was driving and unable to speak.

85. "Mac Jones" then said he was sending Plaintiff yet another email requesting bank statements.

86. On December 1, 2020 at 9:34 AM Mac Jones sent Plaintiff another email.

87. On December 1, 2020 at 10:52 AM Mac Jones called Plaintiff from 915-238-1554 with "Efrain Rojo" displayed on the caller ID.

88. On December 2, 2020 at 9:28 AM Mac Jones called Plaintiff from 915-383-3761 with "Mario Ramos" displayed on the caller ID.

89. On December 2, 2020 at 9:28 AM Mac Jones again called Plaintiff from 915-383-3761 with "Mario Ramos" displayed on the caller ID.

90. On December 3, 2020 at 2:42 PM Mac Jones again called Plaintiff from 915-238-1554 with "Efrain Rojo" displayed on the caller ID.  Ms. Nubia Herrera (Herrera) answered Plaintiff's phone.

91. Nubia Herrera asked who was calling and Mac Jones replied, "Mac from NextDay MCA Funding."

11

92. Herrera took down a message from Mac that included his name, company and email address.

93. On December 3, 2020, Plaintiff reached out to Defendant Bitty Officers Charlie Siegel and Craig Hecker in an attempt to settle this complaint without litigation. Both implausibly claimed Defendant Bitty had no association with the ISO/Brokers from whom they accepted, processed, and approved an application.

94. On December 9, 2020 Mac Jones called Plaintiff from 915-613-2595. Mac Jones emailed Plaintiff another application.

95. On December 10, 2020 Plaintiff called Mac Jones at 888-487-4621. Plaintiff asked Mac Jones to explain his relationship with Defendant Bitty and Defendant MCA. Mac replied "We are a partner lender. We work together in this industry. They are the direct hand in issuing the contract, and we told them to issue the contract."

96. On December 10, 2020 Mac Jones informed Plaintiff his "co worker" Mike McGuiness would be contacting Plaintiff because Mac was going on vacation.

97. On December 11, 2020 Mike McGuiness called Plaintiff for at least the 29th time since September 24, 2020 attempting to solicit products on behalf of the Defendants.

98. Through information and belief Defendant Bitty contracts with and/or employs Defendant MCA as an ISO and/or Broker to make unsolicited spoofed automated phone calls marketing business funding.

99. Through information and belief Defendant Craig Hecker is a co-owner of Defendant Bitty.

100.    Plaintiff received multiple calls from a variety of spoofed caller ID's initiated using an automated telephone dialing system. The calls were made by Defendant MCA and/or Defendant Bitty's ISO/Broker on behalf of Defendant Bitty. The calls generally had a delay of 5-10 seconds of dead air before an audible tone connected the Plaintiff to a representative,

indicating the calls were initiated using an ATDS. The Plaintiff received at least 29 calls in 45 days.

101.   Each and every call was initiated using a spoofed caller ID, and each and every telemarketer the Plaintiff spoke with failed to properly identify themselves and the parties they were calling on behalf of.

102.   Plaintiff received the following calls from the Defendants (Table A).

| Call Phone Number | Name on Caller ID | Date | Time |
|---|---|---|---|
| 551-213-5331 | UNKNOWN NAME | 10/5/2020 | 9:03 AM |
| 551-213-5331 | UNKNOWN NAME | 10/9/2020 | 12:27 PM |
| 646-343-5616 | UNKNOWN NAME | 11/2/2020 | 9:25 AM |
| 646-343-5616 | UNKNOWN NAME | 11/3/2020 | 9:10 AM |
| 646-343-5616 | UNKNOWN NAME | 11/6/2020 | 9:04 AM |
| 551-213-5331 | UNKNOWN NAME | 11/6/2020 | 10:07 AM |
| 646-343-5616 | UNKNOWN NAME | 11/6/2020 | 1:44 PM |
| 551-213-5331 | UNKNOWN NAME | 11/9/2020 | 10:44 AM |
| 646-343-5616 | UNKNOWN NAME | 11/11/2020 | 9:06 AM |
| 646-343-5616 | UNKNOWN NAME | 11/12/2020 | 9:04 AM |
| 551-213-5331 | UNKNOWN NAME | 11/20/2020 | 7:25 AM |
| 551-213-5331 | UNKNOWN NAME | 11/20/2020 | 8:09 AM |
| 551-213-5331 | UNKNOWN NAME | 11/20/2020 | 10:34 AM |
| 915-373-4754 | OSCAR DOMINGUEZ | 11/24/2020 | 1:38 PM |
| 915-373-4754 | OSCAR DOMINGUEZ | 11/24/2020 | 2:45 PM |
| 915-373-4754 | OSCAR DOMINGUEZ | 11/24/2020 | 3:09 PM |
| 915-494-8244 | UNKNOWN NAME | 11/25/2020 | 8:54 AM |
| 915-630-8887 | DAVID MARTINEZ | 11/25/2020 | 10:41 AM |
| 915-494-8244 | UNKNOWN NAME | 11/25/2020 | 11:43 AM |
| 915-373-4754 | OSCAR DOMINGUEZ | 11/25/2020 | 1:05 PM |
| 915-533-2000 | UNKNOWN NAME | 11/30/2020 | 8:49 AM |
| 915-533-2000 | UNKNOWN NAME | 11/30/2020 | 11:35 AM |
| 915-497-0664 | UNKNOWN NAME | 12/1/2020 | 9:31 AM |
| 915-238-1554 | EFRAIN ROJO | 12/1/2020 | 10:52 AM |
| 915-383-3761 | MARIO RAJOS | 12/2/2020 | 9:28 AM |
| 915-383-3761 | MARIO RAJOS | 12/2/2020 | 9:28 AM |
| 915-238-1554 | EFRAIN ROJO | 12/3/2020 | 2:42 PM |
| 915-497-0664 | UNKNOWN NAME | 12/4/2020 | 9:55 AM |
| 915-613-2595 | UNKNOWN NAME | 12/9/2020 | 10:37 AM |

103.   Each and every call failed to identify the telemarketers and parties they were calling on behalf of.

104.   Mr. Callier has a limited data plan. Incoming text messages chip away at his monthly allotment.

105.   Mr. Callier has limited data storage capacity on his cellular telephone. Incoming

telemarketing calls consumed part of this capacity.

106.   No emergency necessitated the calls

107.   Each call was sent by an ATDS.

108.   None of the defendants ever sent Mr. Callier any do-not-call policy.

109.   On information and belief, the defendant did not have a written do-not-call policy while

it was sending Mr. Callier the unsolicited calls

110.   On information and belief, the defendant did not train its agents who engaged in

telemarketing on the existence and use of any do-not-call list.

## BASIS OF LIABILITY

111.   Even if the Defendants claims they did not make the TCPA violating calls to Plaintiff

directly, they are liable for the TCPA violating calls under the following theories of liability:

(1) Direct Liability, (2) Actual Authority, (3) Apparent Authority, (4) Ratification, (5) Acting

in Concert and (6) Joint Enterprise.

## DIRECT LIABILITY

112.   The Defendants' scheme involves the use of illegal robocalling to promote their services.

113.   Defendants' practice of outsourcing its robocalling to a third-party company does not

absolve them form direct liability under the TCPA.

114.   On May 9, 2013, the FCC confirmed this principle in a Declaratory Ruling holding that

sellers may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities
> to unsupervised third parties would leave consumers in many cases without an effective
> remedy for telemarketing intrusions.  This would particularly be so if the telemarketers
> were judgment proof, unidentifiable, or located outside the United States, as is often the
> case.  Even where third-party telemarketers are identifiable, solvent, and amendable to
> judgment, limiting liability to the telemarketer that physically places the calls would
> make enforcement in many cases substantially more expensive and less efficient, since

consumers (or law enforcement agencies) would be required to sue each telemarketer separately in order to obtain effective relief. As the FTC noted, because "[se]ellers may have thousands of 'independent' telemarketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

May 2013 FCC Ruling, 28 FCC Rcd at 65 (¶ 37) (internal citations omitted).

## AGENCY ALLEGATIONS

115. The May 2013 FCC Ruling rejected a narrow view of TCPA liability including the assertion that a seller requires finding a formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 n. 107

116. Prior to conducting discovery in this litigation, due to the anonymous nature of robocalling, Plaintiff has no way to identify the exact relationship between Defendants and robocallers.

117. However, for the purposes of TCPA liability, Plaintiff is not expected to know this information at the pleading stage.

118. The May 2013 Ruling states that called parties may obtain "evidence of these kinds of relationships…through discovery, if they are not independently privy to such information." *Id* at 6592-593 (¶ 46).

## ACTUAL AUTHORITY

119. Defendants authorized John Doe third-party telemarketers to generate perspective customers. Defendants entered into contracts or agreements with third-party telemarketers to solicit their products and services. The John Doe telemarketers' integration of robocalling into the sales process was so seamless that it appeared to an outside party like Plaintiff that the John Doe telemarketers were the telemarketing department of the Defendants.

120. John Doe telemarketers were hired by Defendants, and acted in concert with the Defendants, which permitted Defendants to enjoy the benefits of mass robocalling while

moving the illegal activity "outside their purview."

121. Defendants authorized John Doe telemarketers to generate prospective customers. Defendants hired John Doe telemarketers to promote Defendants' products pursuant to robocalling. Defendants' integration of robocalling into its sales process was so seamless that it appeared to an outside party like Plaintiff that the John Doe telemarketers were the telemarketing department of the Defendants.

122. Accordingly, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *See In re Rules & Regulations Implementing the TCPA*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12931, 12397 (¶ 13)(1995).

123. In their January 4, 2008, ruling the FCC reiterated that a company on whose behalf a telephone call made bears the responsibility for any violations. Id. (specifically recognizing "on behalf of" in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

124. More specifically, the May 2013 FCC Ruling held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. 28 FCC Rcd at 6586 (¶ 34).

125. John Doe telemarketers solicited Plaintiff on behalf of Defendants and had actual authority from Defendants to solicit Plaintiff by using robocalling.

126. The actual authority of the John Doe telemarketers will be illustrated by the compensation paid to the John Doe telemarketers by the Defendants.

## APPARENT AUTHORITY

17

127.   The May 2013 FCC Ruling further clarifies the circumstances under which a telemarketer

has apparent authority

> [A]pparent authority may be supported by evidence that the seller allows the outside
> entity access to information and systems that normally would be within the sellers
> exclusive control, including: access to detailed information regarding the nature and
> pricing of the seller's products and services or to the seller's customer information. The
> ability by the outside sales entity to enter consumer information into the seller's sales or
> customer systems, as well as the authority to use the seller's trade name, trademark and
> service mark may also be relevant. It may also be persuasive that the seller approved,
> wrote or reviewed that outside entity's telemarketing scripts. Finally, a seller would be
> responsible under the TCPA for the unauthorized conduct of a third-party telemarketer
> that is otherwise authorized to market on the seller's behalf if the seller knew (or
> reasonably should have known) that the telemarketer was violating TCPA on the seller's
> behalf and the seller failed to take effective steps within its power to force the
> telemarketer to cease that conduct.

28 FCC Rcd at 6592 (¶ 46).

## RATIFICATION

128.   Defendants knowingly and actively accepted business that originated through illegal

robocalls placed by John Doe telemarketers.

129.   By accepting these contracts, soliciting and executing contracts with the robocall victims,

Defendants "manifest[ed] assent or otherwise consent[ed]…to act" on behalf of John Doe

telemarketers, as described in the Restatement (Third) of Agency.

130.   Defendants ratified the John Doe telemarketers' violations by knowingly accepting the

benefit of new customers despite that the customers were generated through illegal sales

calls.

131.   Defendants took advantage of the violations be having sales people solicit prospective

customers while turning a blind eye to the way the potential customer was identified.

132.   Defendants ratified that John Doe telemarketers TCPA violations by being willfully

ignorant of the violations or by being aware or by being aware that such knowledge was

lacking.

133.   Defendants caused John Doe telemarketers to have the actual authority of Defendants. Restatement § 4.01 cmt. b.

## JOINT ENTERPRISE

134.   Defendants had tacit agreements or approved after the fact with John Doe telemarketers for the marketing of their products pursuant to the John Doe telemarketers illegal robocalls.

135.   Defendants were part of a common enterprise and had a community of interest in marketing and advertising "Student loan forgiveness" from Defendant Summit.

136.   Defendants had equal right to control the conduct thereof by specifying the type of people to be called and the questions to be asked to prospective customers.

137.   Defendants had a duty to exercise due care when marketing their products.

138.   Defendants' violation of the TCPA is negligence per se.

139.   Because of Defendants' negligence, Plaintiff suffered actual and statutory damages.

140.   Defendants are jointly and severally liable for the resulting damage caused by the third party telemarketers TCPA violating telephone calls.

141.

142.   Defendants authorized John Doe telemarketers to generate prospective customers for them.

143.   The integration of their sales efforts with robocalling by Defendants was so seamless it appeared to Plaintiff that the John Doe telemarketers and Defendants all appeared to be acting together as the same company.

144.   Plaintiff reasonably believed and relied upon the fact that John Doe telemarketers received permission to sell, market, and solicit Defendants' products.

145.     The actual authority of the John Doe telemarketers will be illustrated by the compensation paid to the John Doe telemarketers by the Defendants.

146.     Defendant Bitty authorized Defendant MCA and/or ISOs and Brokers to telemarket to generate prospective customers.  Defendant Bitty hired Defendant MCA and/or ISOs and Brokers to promote its products and services.  Defendant Bitty's integration of robocalling into its sales process was so seamless that it appeared to an outside party like Plaintiff that Defendant MCA or the ISO and/or Broker was the telemarketing department of Defendant Bitty.

## THE SELLERS SHOULD BE HELD LIABLE TO UPHOLD THE DETERRENT EFFECT AND PURPOSE OF THE TCPA

147.     As the court ruled in Jackson v Caribbean Cruise Line, Inc., the defendant sellers should be held liable for their violations of the TCPA. Courts have looked at the purpose of the TCPA and found that not holding the sellers liable through vicarious liability would undermine the purpose of the TCPA.

148.     Every entity in the application for "business funding" should be deemed a beneficiary of the calls and held liable for damages under the TCPA under vicarious liability. Sellers are in the best position to monitor and police third party telemarketer's compliance with the TCPA and to hold otherwise would leave consumers without an effective remedy for telemarketing intrusions.

## INJURY, HARM, DAMAGES, and ACTUAL DAMAGES
## AS A RESULT OF THE CALLS

149.     Defendant's calls harmed the Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy."

**150.**  Defendant's calls harmed the Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone.

**151.**  Defendant's calls harmed the Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone line.

**152.**  Defendant's calls harmed the Plaintiff by intruding upon Plaintiff's seclusion.

**153.**  The Plaintiff has been harmed, injured, and damages by the calls including, but not limited to: invasion of privacy, reduced device storage space, reduced data plan usage, reduced enjoyment and usage of my cell phone, reduced battery usage, and anger and frustration.

### The Plaintiff's cell phone is a residential number

154.  The calls were to the Plaintiff's cellular phone 915-383-4604, which is the Plaintiff's personal cell phone that he uses for personal, family, and household use. The Plaintiff maintains no landline phones at his residence and has not done so for at least 10 years and primarily relies on cellular phones to communicate with friends and family. The Plaintiff also uses his cell phone for navigation purposes, sending and receiving emails, timing food when cooking, and sending and receiving text messages. The Plaintiff further has his cell phone registered in his personal name, pays the cell phone from his personal accounts, and the phone is not primarily used for any business purpose.

### Violations of the Texas Business and Commerce Code 305.053

155.  The actions of the defendants violated the Texas Business and Commerce Code 305.053 by placing automated calls to a cell phone which violate 47 USC 227(b). The calls by the defendants violated Texas law by placing calls with a pre-recorded message to a cell phone which violate 47 USC 227(c)(5) and 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC

227(e).

156.    The calls by the defendants violated Texas law by spoofing the caller ID's per 47 USC

227(e) which in turn violates the Texas statute.

## FIRST CLAIM FOR RELIEF

### (Non-Emergency Robocalls to Cellular Telephones, 47 U.S.C. § 227(b)(1)(A))

### (Against All Defendants)

1.      Mr. Callier realleges and incorporates by reference each and every allegation set

forth in the preceding paragraphs.

2.      The foregoing acts and omissions of Defendants and/or their affiliates or agents

constitute multiple violations of the TCPA, 47 U.S.C. § 227(b)(1)(A), by making non-emergency

telemarketing robocalls to Mr. Callier's cellular telephone number without his prior express

written consent.

3.      Mr. Callier is entitled to an award of at least $500 in damages for each such

violation. 47 U.S.C. § 227(b)(3)(B).

4.      Mr. Callier is entitled to an award of up to $1,500 in damages for each such

knowing or willful violation. 47 U.S.C. § 227(b)(3).

5.      Mr. Callier also seeks a permanent injunction prohibiting Defendants and their

affiliates and agents from making non-emergency telemarketing robocalls to cellular telephone

numbers without the prior express written consent of the called party.

## SECOND CLAIM FOR RELIEF

### (Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d))

### (Against All Defendants)

6.      Mr. Callier realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

7.      The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of FCC regulations by making telemarketing solicitations despite lacking:

a.      a written policy, available upon demand, for maintaining a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(1); [2]

b.      training for the individuals involved in the telemarketing on the existence of and use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2);[3] and,

c.      in the solicitations, the name of the individual caller and the name of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. § 64.1200(d)(4).[4]

8.      Mr. Callier is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

9.      Mr. Callier is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

10.     Mr. Callier also seeks a permanent injunction prohibiting Defendants and their affiliates and agents from making telemarketing solicitations until and unless they (1) implement

---

[2] *See id.* at 425 (codifying a June 26, 2003 FCC order).
[3] *See id.* at 425 (codifying a June 26, 2003 FCC order).
[4] *See id.* at 425 – 26 (codifying a June 26, 2003 FCC order).

a do-not-call list and training thereon and (2) include the name of the individual caller and AFS's name in the solicitations.

## THIRD CLAIM FOR RELIEF:

### Violations of The Texas Business and Commerce Code 305.053

11.      Mr. Callier realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

12.      The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of the **Texas Business and Commerce Code 305.053**, by making non-emergency telemarketing robocalls to Mr. Callier's cellular telephone number without his prior express written consent in violation of 47 USC 227 et seq. The Defendants violated 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e) by using an ATDS that does not comply with the technical and procedural standards under this subsection.

13.      Mr. Callier is entitled to an award of at least $500 in damages for each such violation. **Texas Business and Commerce Code 305.053(b)**

14.      Mr. Callier is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. **Texas Business and Commerce Code 305.053**(c).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brandon Callier prays for judgment against the defendants jointly and severally as follows:

A.      Leave to amend this Complaint to name additional DOESs as they are identified and to conform to the evidence presented at trial;

B.      A declaration that actions complained of herein by Defendants violate the TCPA and Texas state law;

24

C.      An injunction enjoining Defendants and their affiliates and agents from engaging in the unlawful conduct set forth herein;

D.      An award of $3000 per call in statutory damages arising from the TCPA intentional violations jointly and severally against the corporation and individual for 29 calls.

E.      An award of $1,500 in statutory damages arising from violations of the Texas Business and Commerce code 305.053

F.      An award to Mr. Callier of damages, as allowed by law under the TCPA;

G.      An award to Mr. Callier of interest, costs and attorneys' fees, as allowed by law and equity

H.      Such further relief as the Court deems necessary, just, and proper.

August 16, 2021                                 Respectfully Submitted,

Brandon Callier
Pro-se
6336 Franklin Trail
El Paso, TX 79912
915-383-4604